IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CARRIS JAMES,                        )
                                     )
            Plaintiff,               )
                                     )
    v.                               )    No.  09 C 7873
                                     )
HYATT REGENCY CHICAGO,               )
                                     )
            Defendant.               )

MEMORANDUM OPINION AND ORDER

Carris James ("James") has sued his employer, Hyatt Regency Chicago ("Hyatt"), advancing charges (1) of retaliation and interference with his rights under the Family Medical Leave Act ("FMLA," 29 U.S.C. §§2601 to 2654) and (2) of discrimination and retaliation in violation of the Americans with Disabilities Act ("ADA," 42 U.S.C. §§12101 to 12117).[1]  Hyatt has moved for summary judgment under Fed. R. Civ. P. ("Rule") 56, and the parties have proceeded in accordance with this District Court's LR 56.1.[2]  For the reasons stated here, Hyatt's Rule 56 motion is

---

[1]  Further citations to FMLA and ADA provisions will take the form "Section --," respectively referring to the Title 29 and Title 42 numbering rather than to the statutes' internal numbering.  That dual usage can create no confusion, because the numbering of the two statutes is so different.

[2]  LR 56.1 requires parties to submit evidentiary statements and responses to such statements to highlight which facts are disputed and which facts are agreed upon.  This opinion cites to Hyatt's LR 56.1 statement as "H. St. ¶--," to James' LR 56.1 statement as "J. St. ¶--" and to the parties' responses as "H. Resp. ¶--" and "J. Resp. ¶--."  Where a party's response does not provide a version of the facts different from the original statement, this opinion cites only that original statement.  Citations to James' memorandum take the form "J. Mem. --."

granted and this action is dismissed.

## Summary Judgment Standard

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).[3]  For that purpose courts consider the entire evidentiary record and must view all of the evidence and draw all inferences from that evidence in the light most favorable to nonmovants (Egan Marine Corp. v. Great Am. Ins. Co. of N.Y., -- F.3d --, 2001 WL 5924425, at *9 (7th Cir. Nov. 23)).  But a nonmovant must produce more than "a mere scintilla of evidence" to support the position that a genuine issue of material fact exists and "must come forward with specific facts demonstrating that there is a genuine issue for trial" (Carmichael v. Vill. of Palatine, Ill., 605 F.3d 451, 460 (7th Cir. 2010), quoting Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir. 2008)).  As Hall v. Bodine Elec. Co., 276 F.3d 345, 354 (7th Cir. 2002) has explained in confirming the appropriateness of a summary judgment:

> It is well settled that conclusory allegations and self-serving affidavits, without support in the record, do not create a triable issue of fact.

---

[3] At the summary judgment stage, of course, nonmovant James need not "establish" or "show" or "prove" anything, but must merely demonstrate that a genuine issue of material fact exists. This opinion's later employment of the quoted terms is due to the cited cases' use of that terminology, but this Court imposes on James the lesser burden described earlier in this footnote.

Ultimately summary judgment is warranted only if a reasonable
jury could not return a verdict for the nonmovant (<u>Anderson v.
Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). What follows is
a summary of the relevant facts, viewed of course in the light
most favorable to nonmovant James.

### Factual Background[4]

Hyatt, a hotel located in Chicago, Illinois, has
continuously employed James as a steward since 1985 (H. St. ¶¶3,
8). Throughout his employment with Hyatt, James has been a
member of Local 1 UNITE HERE ("Union"), and his pay, benefits and
other terms of employment are governed by a Collective Bargaining
Agreement ("CBA") negotiated between Hyatt and Union (<u>id</u>. ¶¶14-
15).

Stewards are responsible for maintaining the cleanliness of
Hyatt's food service areas and ballrooms and transporting food
items and equipment (H. St. ¶11; Complaint ¶27). Most of James'
job responsibilities require him to lift heavy objects or bend

---

[4] James purports to deny a large number of the facts
described below, but in each instance the denial is critically
flawed in one or more of several ways. First, many denials are
based on mischaracterizations of the supporting documents or
testimony. Second, others are not truly denials of a fact
adduced by Hyatt but rather deny some "implication" that James
believes follows from that fact. Third, some denials rely solely
on James' own ipse dixit opinion or characterization, completely
unsupported (or in some instances contradicted) by the record.

over or both (id. ¶12).[5]  One of James' supervisors testified
that he did not know of any other jobs at Hyatt that James--who
has an eighth grade education--is qualified to perform (H. Resp.
¶95; J. St. ¶72).

James was born with very poor vision (J. St. ¶72; H. Resp.
¶72).[6]  On his Hyatt job application James described himself as
having a "vision problem that is corrected with eyeglasses and
magnifying glass," but his vision did not limit or affect his
ability to perform his job and was never mentioned in any
performance review (H. St. ¶¶13, 16-17).  None of James'
supervisors or members of Hyatt's human resources team viewed
James as having any significant impairment in that respect or
knew that he claims to be legally blind, although Hyatt was aware
that James was nearsighted and accommodated him by increasing the
print size on his work assignments and schedules (id. ¶69; J.
Resp. ¶69).  James regularly received positive performance

_____

[5]  In one example of the flaws addressed in n.4, James
denies that description of his job responsibilities based solely
on his own testimony and affidavit (J. Resp. ¶12), which are
directly contradicted by the testimony of his supervisors, Al
Bozeman ("Bozeman") and Jerome Cook ("Cook"), as well as by a
2006 job description of James' position (H. St. ¶12).  Such
wholly unsupported assertions by James fly in the face of the
direct evidence to the contrary and are insufficient to create an
issue of fact (Hall, 276 F.3d at 354).

[6]  Whether James is legally blind or is "just short of legal
blindness," as one of his doctors testified, is contested (id.).
But that contest has no relevance in terms of the ruling in this
opinion.

4

reviews, was treated fairly by his supervisors and was described by Cook as "an extremely valuable employee" (J. Resp. ¶17; H. St. ¶¶17-18).

In March or April 2007[7] James was punched in the face during a fight (which did not occur at Hyatt), resulting in an injury to his left eye (H. St. ¶19). James missed one day of work due to the incident but worked for several weeks thereafter until he developed a retinal detachment in that eye (id. ¶¶20-21). James sought treatment from Drs. Lance Scott and James Green among others, and he underwent corrective surgery on April 20 (id. ¶¶22, 24). His vision was ultimately restored to its pre-surgery state (id. ¶25).

After his surgery James was understandably absent from work (H. St. ¶28). When Hyatt's Assistant Human Resources Director Lea Nissen ("Nissen") and Human Resources Coordinator Zikkiyyia Perez ("Perez") learned that James' absence was attributable to a medical issue, they provided him with information regarding FMLA leave, including an FMLA medical certification form (id. ¶29). James returned to Perez a completed form requesting FMLA leave on April 25, five days after surgery (id. ¶30). Perez immediately granted the request and applied the FMLA leave retroactively to cover James' absences beginning on April 19 (id. ¶31). James

---

[7] All date references hereafter that omit the designation of a year relate to occurrences during 2007.

testified that he was treated fairly during the FMLA application process (id. ¶33).

Under the FMLA, eligible employees are entitled to 12 weeks of leave during any 12 month period if they suffer "a serious health condition that makes the employee unable to perform the functions of the position of such employee" (Section 2612(a)(1)(D)). Although James exhausted his FMLA 12-week entitlement on or about July 13, the CBA entitled him to remain on leave with job protection for up to one year from his original absence (or until April 19, 2008) (H. St. ¶¶42-43).[8]

On or about April 24 James gave Perez a note from Dr. Scott (the "April 24 Note") stating that James could return to "light duty" on May 10 (H. St. ¶34). That April 24 Note did not list any specific restrictions, but in light of James' more demanding job responsibilities it was clearly not a release to full duty (id. ¶35). James testified that Perez told him that the "restriction" to "light duty" needed to be "removed," but he did not provide any explanation of the April 24 Note, what restrictions he may have had, what type of light duty he was

---

[8] James contends that the entire 52 week period of job protection under the CBA should be considered FMLA leave (J. Resp. ¶42). But Hyatt's provision of job protection beyond the 12 week FMLA period via its contractual arrangement with Union does not magically expand the parameters of the FMLA, even if Nissan, Perez or other Hyatt employees described all 52 weeks as FMLA leave (Breneisen v. Motorola, Inc., 656 F.3d 701, 705 (7th Cir. 2011)).

capable of performing or how long he needed light duty (id. ¶36). Perez did not ask what "light duty" meant (J. St. ¶74), but Dr. Scott testified it was intended to restrict James from "lifting anything heavy" (Scott Dep. 47). Hyatt does not have a policy that pertains to assigning "light duty" to employees returning from medical leave (J. St. ¶98).

Between April 24 and August James submitted a substantial amount of disability benefit paperwork to Hyatt and its short-term disability provider, representing that he was unable to work in any capacity, and he received disability benefits based on those representations (H. St. ¶¶38-39). Forms provided by Dr. Scott stated that he was "not sure" when James could return to work (May 11 and June 14 forms), that James would be disabled until August 20 (June 1 form) and that James would be disabled until August 5 (August 2 form)(James Dep. Exs. 18-20, 23, 25-27). Dr. Scott also left blank the end date of James' continuous disability on a July 12 form (id.).

At James' request and per Dr. Scott's representations, Hyatt completed all disability paperwork that it received and did not interfere with James' benefit requests (H. St. ¶40). James also provided Hyatt with a May 9 authorization for the release of certain health information "for the purposes of authorizing a medical leave" (J. St. ¶94; HRC 564).

On or about August 2 James submitted to Perez another note

from Dr. Scott (the "August 2 Note") that stated James could return to work on August 5 with the restriction of "visually impaired" (H. St. ¶44).[9]  James testified that Perez told him he could not return with restrictions, but he did not explain how he or Dr. Scott believed the noted restriction of "visually impaired" impacted his ability to do his job (id. ¶45).  James did not return to work on August 5, and Dr. Scott continued to represent to Hyatt that James had been continuously disabled since April 20 on disability forms dated August 13 and September 20 (id. ¶¶47, 49).

On September 25 James faxed Hyatt a doctor's note (the "September 25 Note") from Dr. Tracy Matchinski stating that James could return to work with the restriction of "no heavy lifting or excessive bending over" (H. St. ¶50).  There was no mention of the "visual impairment" referred to in the August 2 Note (id.

_____

[9]  James asserts that Dr. Scott indicated James "was able to work and perform the essential functions of his job" in the April 24 and August 2 Notes as well as on "physician releases" dated May 11 and July 10 (J. Resp. ¶41).  That is simply not true, and James' counsel could not so represent in the objective good faith demanded by Rule 11(b).  In response to the question "If medical leave is required for the employee's absence from work because of the employee's own condition...is the employee unable to perform work of any kind?" (emphasis in original).  Dr. Scott answered affirmatively in both the May 11 and July 10 Notes (HRC 0551, 0557).  As for the April 24 Note, it released James only for light duty, while the August 2 Note imposed the restriction of visually impaired (HRC 0547, 0558).  Thus none of the four documents explained whether James was capable of performing the essential functions of his job, and two explicitly stated that James was unable to do any work whatever.

8

¶51). James has offered no additional explanation of the September 25 Note or of the listed restrictions (id. ¶52)--and heavy lifting and frequent bending over are essential functions of James' job (H. Resp. ¶81). James testified that he did not make any further attempts to return to work after submitting the September 25 Note (id. ¶99).

Perez testified that after receiving one of the April 24, August 2 or September 25 Notes--it is unclear which--Nissen instructed her that James needed a doctor's note releasing him to full duty (Perez Dep. 170-71). As Nissen directed, Perez informed James of that requirement (id. 169), and she reiterated the requirement to James in December (id. 174).

Perez also testified that Hyatt employee Annette Munoz trained her to determine whether employees on medical leave had been released to full duty, and if not to seek clarification from the employee (id. 218). If an employee presented a doctor's note containing restrictions, Perez would "let the [employee] know that we need a doctor's note stating when they can come back to full duty" (id. 223). Various other Hyatt employees testified (1) that there is no overall policy requiring employees to present a full duty release before being reinstated and (2) that Hyatt assists employees seeking to return with restrictions whenever possible (H. Resp. ¶¶89, 98).

Sometime after receipt of the September 25 Note, Hyatt's

9

Workers' Compensation and Safety Manager James Parsons
("Parsons"), who oversaw employee leaves of absence beginning in
the fall of 2007, had a conversation with James and Perez in
which he explained that Hyatt needed clarification on the various
restrictions identified by James' doctors in order to return
James to work (H. St. ¶53).  When Hyatt received no further
clarification, Parsons and Nissen discussed requesting
clarification directly from James' doctor (id. ¶55).  So on
January 15, 2008 Parsons sent a letter to Dr. Scott requesting
clarification of James' restrictions and enclosing a return-to-
work certification and job analysis for James' position (id.
¶56).  Dr. Scott responded within two weeks (on January 28),
stating that James could return to work but could not complete
any tasks that required vision better than 20/200 (id. ¶60).
After Hyatt received that clarification, James met with Bozeman
and Human Resources Director Merrick Dresnin ("Dresnin") to
discuss James' return to work (id. ¶62).  During the meeting
James requested and was granted two weeks of paid vacation (id.
¶64).

On February 17, 2008 James returned to work in the same
position, shift and seniority level as before his leave of
absence (H. St. ¶¶63, 65).  He feels he has been treated fairly
since his return (id. ¶67).  No one at Hyatt has said anything
negative to James about his leave, eye surgery or visual

limitations since his return (id. ¶68). James' last consultation
with a doctor regarding his retinal detachment was in 2008, and
the doctor determined he was "fine" (H. St. ¶66).

James filed an EEOC charge on January 18, 2008 and a
grievance with Union on January 29, 2008 (H. St. ¶¶57-58). Union
refused to proceed on James' grievance, and James did nothing to
follow up with Union thereafter (id. ¶59).

Both the EEOC charge and James' Complaint in this action
allege that Hyatt wrongfully prevented James from returning to
work in August 2007. Neither, however, mentions any earlier
alleged refusal to return James to work (J. Resp. ¶71).

## FMLA Interference

Under the FMLA an employer must not "interfere with,
restrain, or deny the exercise of or the attempt to exercise" any
FMLA rights (Section 2615(a)(1)). Every employee on FMLA leave
has the right to be restored either to the same position that he
or she had before taking such leave or to an equivalent position
(Section 2612). But if the employee cannot perform an essential
function of the original position because of a physical or mental
condition, he or she has no right to restoration to a different
position under the FMLA (29 CFR §825.216(c)).

To succeed on an FMLA interference claim, James "must show
that: (1) [ ]he was eligible for the FMLA's protections;
(2) [his] employer was covered by the FMLA; (3) [ ]he was

11

entitled to take leave under the FMLA; (4) [ ]he provided sufficient notice of [his] intent to take leave; and (5) [his] employer denied [him] FMLA benefits to which [ ]he was entitled" (Goelzer v. Sheboygan County, Wis., 604 F.3d 987, 993 (7th Cir. 2010)).

Hyatt does not dispute James' satisfaction of the first four requirements, but it contends that no reasonable jury could find that Hyatt denied James any FMLA benefit. To prevail James must show a genuine issue of material fact as to whether Hyatt wrongfully prohibited him from returning to work before the expiration of his FMLA leave on July 13, 2007. Of the three doctors' release Notes that James submitted--as contrasted with the numerous disability documents and FMLA certifications that stated James was unable to work--only the April 24 Note fell within that time frame, and it limited James to "light" duty.[10] As Hendricks v. Compass Group, USA, Inc., 496 F.3d 803, 805 (7th Cir. 2007) teaches, "[t]here is no such thing as 'FMLA light duty' whether pursuant to the statutes or their corresponding regulations."

In any event, James repeatedly represented to Hyatt throughout the remainder of his FMLA leave (and thereafter as well) that he had been continuously disabled and unable to work

---

[10] There is no need to repeat the amorphous nature of that term, covered thoroughly in the **Factual Background** section.

since April 20, 2007 (James Dep. Exs. 18-20, 23, 25-27). Because James was also not entitled to restoration to a different position under the FMLA, his interference claim fails.

### FMLA Retaliation

Employers are prohibited from discharging or otherwise discriminating against any individual for opposing any practice made unlawful by the FMLA or for exercising FMLA rights (Section 2615(a)(2); 29 C.F.R. §825.220(a)(2)). Claims for retaliation under the FMLA can proceed through either the direct or indirect method of proof (Daugherty v. Wabash Ctr., Inc., 577 F.3d 747, 751 (7th Cir. 2009)).

Under the direct method a plaintiff such as James must show (1) he engaged in a statutorily protected activity, (2) his employer took a materially adverse action against him and (3) a causal connection between the two, which requires either an admission of retaliation or a "convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker" (Daugherty, id., quoting Phelan v. Cook County, 463 F.3d 773, 779 (7th Cir. 2006)). Little explanation is needed to knock James out of the box on that alternative.

First, James does not contend that Hyatt admitted retaliating against him. To the contrary, he testified that he was treated fairly both during the FMLA application process and

after his return from medical leave, and no one has said anything negative to him regarding his leave or visual limitations (H. St. ¶¶33, 67, 68). Nor can James show a convincing mosaic of circumstantial evidence pointing to intentional discrimination. It was Hyatt itself that identified James' need for FMLA leave to cover his absences (id. ¶29), and it is more than illogical that the very same Hyatt employees (Nissen and Perez) would first proactively reach out to offer James FMLA leave and then intentionally retaliate against him only days later for taking the leave they offered him.[11]

Moreover, James also submitted numerous forms to Hyatt representing that he was disabled and unable to work both during and after his FMLA leave, sometimes within days of the "return to work" date identified in a doctor's release (id. ¶¶38, 39, 47, 49). Hyatt reinstated James promptly after receiving the requested clarification of the restrictions imposed in the three Notes--clarification that had not been forthcoming from James despite his having been asked to provide it (id. ¶¶53, 55). Under those circumstances no reasonable jury could conclude that Hyatt's failure to return James to work at an earlier date was

---

[11] James' first medical release, the April 24 Note, is dated one day before James submitted the paperwork requesting FMLA leave and Perez granted his request. According to James, Perez granted his request for FMLA leave and intentionally retaliated against him for taking it almost simultaneously. Such an interpretation of the situation more than strains credulity.

14

the result of intentional retaliation through the direct method.[12]

As for the indirect method of pursuing a claim for FMLA retaliation, that requires the employee to "establish a prima facie case by showing that [ ]he (1) engaged in a statutorily protected activity; (2) met [his] employer's legitimate expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees who did not engage in statutorily protected activity" (Simpson v. Office of Chief Judge of Circuit Court of Will County, 559 F.3d 706, 718 (7th Cir. 2009)). If the employee satisfies the four prima facie elements, the burden of production shifts to his employer to articulate a nondiscriminatory reason for the adverse employment action (id.). If the employer is successful, the employee must show that the proffered reason is pretextual (id.).

James cannot proceed under the indirect method because he admits he cannot show that he was treated less favorably than any other similarly situated employee (J. Mem. 8). Bizarrely, he

---

[12] James asserts that Hyatt's failure to return him to work was due to Hyatt's alleged full-duty release policy rather than a lack of clarity in the medical releases and that this amounts to retaliation under the FMLA (J. Mem. 6). But even if Hyatt had such a purported policy (which this opinion does not assume), the FMLA does not require an employer to restore an employee to a position different from the one that he held before taking FMLA leave. Hence Hyatt cannot have violated the FMLA by refusing to return James to a "light duty" position as advised in the April 24 Note.

instead argues in the face of firmly established caselaw
authority that such a showing is unnecessary (id.).  James'
purported authority for that position, Leffel v. Valley Fin.
Servs., 113 F.3d 787, 794 (7th Cir. 1997), is inapposite because
it dealt not with FMLA retaliation but with an ADA discrimination
claim by an employee whose position had "unique aspects," so that
she could not point to any similarly situated employees.  In the
universe occupied by James' counsel, a 1997 decision dealing with
a wholly different factual situation can somehow prevail over
Simpson, an all-fours precedent handed down a dozen years later
(and just two years ago)!  In sum, James' claim of FMLA
retaliation succumbs under the indirect method as well.

### ADA Failure To Accommodate

Claims of failure to accommodate under the ADA require
direct proof and may not proceed through the indirect method
outlined above (Bultemeyer v. Fort Wayne Cmty. Sch., 100 F.3d
1281, 1283-84 (7th Cir. 1996)).  To establish a prima facie case
of failure to accommodate, "a plaintiff must show that: (1) [ ]he
is a qualified individual with a disability, (2) the employer was
aware of [his] disability; and (3) the employer failed to
reasonably accommodate the disability" (Kotwica v. Rose Packing
Co., 637 F.3d 744, 747-48 (7th Cir. 2011)).  Under the version of
ADA Section 12111(8) that was in effect during James' leave, a
"qualified individual with a disability" was defined as "an

individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."

To qualify as having a disability, the plaintiff must possess "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment" (Section 12102(1)). Short-term temporary impairments or medical conditions that have little or no long-term impact do not qualify as disabilities for ADA purposes (Serednyj v. Beverly Healthcare, LLC, 656 F.3d 540, 554 (7th Cir. 2011)), but "an intermittent impairment that is a characteristic manifestation of an admitted disability is...part of the underlying disability and hence a condition that the employer must reasonably accommodate" (Vande Zande v. Wis. Dep't of Admin., 44 F.3d 538, 544 (7th Cir. 1995)).

Ordinarily a retinal detachment that is successfully corrected by surgery and has no long-term impact would not amount to a disability under the ADA, but in this case James contends that it may have been a complication of his long-standing legal blindness (or near legal blindness) rather than a result of being punched in the eye. Given Dr. Green's testimony that the detachment could have been caused by James' myopia (Green Dep. 69), James has at least raised a genuine issue of material fact

17

as to whether his retinal detachment is a manifestation of his legal blindness and would therefore qualify for ADA protection. Because it is undisputed that Hyatt was aware of James' retinal detachment, the sole issue is whether it failed to reasonably accommodate James' retinal detachment.

Once an employee has informed his employer of his disability and asked for an accommodation, the employer must then engage in an interactive process with the employee to determine the possibility of a reasonable accommodation (Hansen v. Henderson, 233 F.3d 521, 523 (7th Cir. 2000)). But if the employer can show that no reasonable accommodation was possible, then failure to engage in any such interactive process cannot give rise to a claim for relief (id.). As Miller v. Ill. Dep't of Transp., 643 F.3d 190, 199 (7th Cir. 2011), teaches:

> [T]ask reassignments within a job can be unreasonable in situations where the reassigned task is an essential function of the job. In those situations, reassignment or delegation of the task would equate, essentially, to reassignment or delegation of the job itself.

ADA regulations state that courts should give "consideration...to the employer's judgment as to what functions of the job are essential," and preexisting written job descriptions are considered evidence of essential functions (Section 12111(8) (2008)).

As late as September 25, 2007 James' doctors represented to Hyatt that he had a restriction of no heavy lifting or excessive

18

bending over--two essential functions of his position, according to James' supervisors and Hyatt's 2006 written job description. Reassigning these tasks to another employee would not be a reasonable accommodation (<u>Miller</u>, 643 F.3d at 199). James' failure to accommodate claim therefore fails in all events, and this opinion need not consider whether Hyatt failed to engage in an interactive process to arrive at a reasonable accommodation.

### ADA Discrimination

Under the version of the ADA that was in effect during James' leave, employers were prohibited from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual" (<u>Buie v. Quad/Graphics, Inc.</u>, 366 F.3d 496, 502 (7th Cir. 2004)(quoting the language of Section 12112(a)). As set out earlier, James cannot show that he was a qualified individual because his doctors represented that he was unable to perform essential functions of his position.[13] So, his ADA discrimination claim fails as well.

### ADA Retaliation

Employers may not retaliate against employees who assert their right under the ADA to be free from discrimination,

---

[13] Even if James could demonstrate that Hyatt had a "100% healed" policy--which is impermissible under the ADA--that would not save his claim. Hyatt was still within its rights to refuse reinstatement to an employee who could not perform the essential functions of his position, and therefore any alleged "100% healed" policy would not have been the "but for" cause of Hyatt's refusal to reinstate.

"regardless of whether the initial claims of discrimination are meritless" (Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522, 657 F.3d 595, 601 (7th Cir. 2011)). Claims may proceed via the direct or indirect methods, which are identical to those described in the FMLA retaliation context (id.). James loses under either method.

As for the direct method, James cannot show a causal connection between a statutorily protected activity and an adverse action. By the time he first complained about ADA discrimination on January 18, 2008, Hyatt was already attempting to reinstate him despite his lack of cooperation (H. St. ¶¶55, 56). Nor can James show he "was singled out for an adverse employment action that similarly situated employees who did not engage in protected activity did not suffer" (Dickerson, 657 F.3d at 601-02). No evidence has been presented to suggest either that James was treated differently than any other employee who asserted a right to be free from discrimination or that James suffered any adverse consequences as a result of his protected activity. To the contrary, James has been continuously employed by Hyatt throughout this litigation and has acknowledged that he has been treated fairly during that time.

## Conclusion

With no genuine issue of material fact having been identified on any of James' theories of recovery, Hyatt is

entitled to a summary judgment in all respects.  This action is dismissed.

_____
Milton I. Shadur
Senior United States District Judge

Date:  December 12, 2011